UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05CV-204-H

U.S. CAVALRY STORE, INC. .                             PLAINTIFF

V.

IRONWOLF ENTERPRISES AND                            DEFENDANTS
DAVID S. FORCE

**MEMORANDUM OPINION**

      Defendants have moved to dismiss for lack of personal jurisdiction. Plaintiff U.S. Cavalry Store, Inc. ("U.S. Cavalry") is a Delaware corporation with its corporate headquarters and principal place of business in Radcliff, Kentucky. It is a supplier of military, law enforcement, and homeland security equipment. Defendant David S. Force ("Mr. Force") is the owner of Defendant IronWolf Enterprises ("IronWolf"), a Pennsylvania corporation with its headquarters and principal place of business in Berwick, Pennsylvania.[1] IronWolf acts as a broker for companies that must purchase military equipment or surplus from manufacturers in order to meet contractual obligations to third parties. IronWolf is also a retailer of military equipment and surplus.

      In August 2004, U.S. Cavalry entered into a contract with the United States Army (the "Army Contract") for the provision of certain military equipment to overseas troops. To fulfill its obligations under the Army Contract, U.S. Cavalry entered into agreements with certain third

---

[1] The Court refers to them collectively as "IronWolf."

party suppliers and brokers, including IronWolf. Subsequently, a dispute arose about the quality of the goods IronWolf supplied to U.S. Cavalry. In response, U.S. Cavalry ceased payment to IronWolf and sued in this Court, claiming breach of contract, breach of implied covenants of good faith and fair dealing, and fraud and misrepresentation.

In its motion to dismiss, IronWolf argues that its contacts with Kentucky are insufficient to support personal jurisdiction in this Court. The Court concludes that IronWolf's limited contacts with Kentucky make this Court's exercise of jurisdiction over it improper in this case.

I.

The Court has not conducted an evidentiary hearing to determine jurisdiction. Accordingly, the Court reviews the pleadings and affidavits in the light most favorable to U.S. Cavalry and will not consider IronWolf's version of any disputed facts. *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000). The factual disputes are minor, although the parties strongly disagree as to the legal significance of certain events.

U.S. Cavalry's CEO, Wayne I. Weisler, initiated contact with IronWolf regarding the Army Contract in late July of 2004, when he placed a call from his New Jersey office to Mr. Force at IronWolf's Pennsylvania office.[2] In the call, Mr. Weisler stated that he wanted to discuss the possibility of U.S. Cavalry and IronWolf developing a business relationship, beginning with IronWolf's participation in the Army Contract. On July 30, 2004, Mr. Weisler

---

[2] This was the first time Mr. Force had spoken with a U.S. Cavalry officer or employee about a business venture, although IronWolf had filled a few orders for military goods for U.S. Cavalry in the preceding three years. Those orders totaled less than $10,000 in revenue, and in each case the goods were shipped directly to the Army in New Cumberland, Pennsylvania. Since its incorporation, IronWolf has also made additional shipments of mail-order goods to Kentucky. However, the total number of the shipments in those twelve years has been less than 100, and the shipments have accounted for less than 1% of IronWolf's annual revenue (an amount that is usually less than $1,000 per year).

traveled to IronWolf's offices in Pennsylvania and met with Mr. Force and Mr. Force's father for approximately three hours. The meeting included discussion of IronWolf's participation in the Army Contract. Over the next month, Mr. Weisler and Mr. Force corresponded regarding the Army Contract. In a letter dated August 27, 2004, Mr. Weisler invited Mr. Force to meet in Pittsburgh to finalize a delivery schedule and payment terms. Accordingly, on August 30, 2004, Mr. Weisler, Dennis Garvey (U.S. Cavalry's Chief Operating Officer), and the Forces met in Pittsburgh. The meeting lasted approximately one hour and included discussion of IronWolf's participation in the Army Contract. Thereafter, U.S. Cavalry prepared and sent to IronWolf a Purchase Order/Specification Sheet (the "Contract"), which Mr. Force signed at IronWolf's Pennsylvania office on September 15, 2004 and faxed to U.S. Cavalry's Kentucky headquarters.

Following the finalization of the Contract, IronWolf began purchasing military equipment to fulfill its obligation to U.S. Cavalry. None of this equipment was purchased from Kentucky vendors, and none was shipped from or delivered to Kentucky. All of the equipment was delivered to IronWolf's Pennsylvania facility for inspection before being shipped to the Army in New Cumberland, Pennsylvania. During this time, U.S. Cavalry learned that IronWolf was not meeting delivery deadlines and was delivering goods and equipment that did not conform to the Contract specifications, among them the requirement that the goods be "Made in the USA." U.S. Cavalry and IronWolf discussed these problems in a series of telephone calls and email exchanges between U.S. Cavalry's Kentucky headquarters and IronWolf's Pennsylvania office. On October 12, 2004, Mr. Force traveled to Kentucky to meet with U.S.

Cavalry representatives to discuss the problems with the Contract.[3]  At the meeting, the parties discussed both the provisions of the Contract and other potential business opportunities between IronWolf and U.S. Cavalry.[4]  The final meeting between Mr. Force and Mr. Weisler took place in Aberdeen, Maryland on October 27, 2004, where they met with three government employees to discuss the origin of certain goods provided to the Army under the Contract.

Subsequent to the Aberdeen meeting, the Army ceased making payments to U.S. Cavalry, which in turn ceased payment to IronWolf and filed this action.  The total consideration to be paid to IronWolf under the Contract was $2,144,030.  Prior to the current dispute, U.S. Cavalry paid IronWolf $1,485,140.93, and a majority of those payments originated from the U.S. Cavalry financial institution in Elizabethtown, Kentucky.

II.

To determine whether personal jurisdiction exists over a nonresident defendant in a diversity action, this Court must apply Kentucky law, subject to due process limitations.  *See Welsh v. Gibbs*, 631 F.3d 436, 439 (6th Cir. 1980); *Hillerich & Bradsby Co. v. Hall*, 147 F. Supp. 2d 672 (W.D. Ky. 2001).  Kentucky's long-arm statute provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from that person's . . . [t]ransacting any business in this Commonwealth . . . [or] [c]ausing

---

[3] IronWolf claims that U.S. Cavalry invited Mr. Force to visit Kentucky to discuss future potential business opportunities rather than problems with the Contract.  IronWolf further claims that the parties discussed the Contract for only ten minutes of the two hour meeting.  In its version of the facts, U.S. Cavalry does not specify the length of time each subject was discussed; however, the Court considers the length of the discussion immaterial for purposes of this analysis.

[4] U.S. Cavalry claims for the first time in its brief that it was during this meeting that Mr. Force made the fraudulent representations that are in part the subject of the instant lawsuit.  The complaint contains no specifics regarding the date or location of the alleged fraudulent statements.

4

tortious injury by an act or omission in this Commonwealth." KY. REV. STAT. ANN. § 454.210(2)(a) (West 2005). This provision allows Kentucky courts to exercise jurisdiction to the fullest extent permitted by due process. *See Info-Med, Inc. v. National Healthcare, Inc.*, 669 F. Supp. 793, 795-96 (W.D. Ky. 1987). Accordingly, this Court will merge the determination of how far Kentucky intended its long-arm jurisdiction to reach with the question of whether finding jurisdiction in this case would comport with the requirements of due process. *See First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1125 (6th Cir. 1982).

The Due Process Clause permits the exercise of both general and specific jurisdiction. General jurisdiction exists when a defendant has "continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-415 & nn 8-10 (1984); *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989). By contrast, specific jurisdiction subjects the defendant to suit in the forum state "only on claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (quoting *Helicopteros,* 466 U.S. at 414 & n. 8). Although the plaintiff has the burden of establishing personal jurisdiction over the defendant, where the court decides the jurisdictional question based only upon the written submissions of the parties, the plaintiff satisfies this burden by making a prima facie case of jurisdiction. *See Welsh*, 631 F.2d at 438. U.S. Cavalry argues that IronWolf is subject to either general or specific jurisdiction.

The question of general jurisdiction is easily resolved. Courts have set forth several nonexclusive factors to consider in an analysis of general jurisdiction:

- Whether a defendant is licensed to do business in the forum state and has an agent for service of process in that state;
- Whether a defendant maintains an office, bank account, telephone listing, or employees in the forum;
- Whether a defendant owns any property in the forum;
- Whether a defendant solicits sales by telephone or otherwise in the forum state;
- Whether a defendant has paid taxes to the forum state or collected sales tax for the forum state; and
- The volume of a defendant's business in the forum.

*See Helicopteros*, 466 U.S. at 416-19; *Conti v. Pneumatic Products Corp.*, 977 F.2d 978, 981 (6th Cir. 1992).

IronWolf has no physical presence in Kentucky, owns no property in Kentucky, and is not registered to do business in Kentucky. There has been no evidence or allegation that IronWolf actively solicits business in Kentucky. Further, IronWolf has established that the volume and frequency of its shipments to Kentucky is sporadic and insubstantial – over the preceding twelve years, the total amount of IronWolf's shipments to Kentucky has been approximately $12,000, less than 1% of IronWolf's annual revenue. On these facts, there is no basis for a finding of general jurisdiction.

### III.

The question of specific jurisdiction is much closer. To subject a nonresident defendant to specific personal jurisdiction without violating due process, the defendant must have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). The Sixth Circuit follows a three-part test for determining whether a nonresident defendant has the requisite minimum contacts:

First, the defendant must purposefully avail himself of the privilege of acting in

> the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968) (footnote omitted).

As the Supreme Court explained in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), the purposeful availment requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."  This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous or attenuated contacts."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotation omitted).

In a jurisdictional inquiry, the Court will "consider the jurisdictional facts of each case individually [in order] to make judgments as to the substantiality of contacts with the forum state and the fairness and justice of subjecting a specific defendant to the in personam jurisdiction of the forum state."  *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 446 F.2d 220, 225-26 (6th Cir. 1972).  In making this determination, the Court must consider the prior negotiations of the parties, the future consequences contemplated by the parties, the terms of the contract, and the parties' actual course of dealing.  *See Burger King*, 471 U.S. at 478-79.  No single factor dominates this determination; rather, the Court will carefully evaluate all of the facts and circumstances of the parties' business relationship taken as a whole.

Certainly, IronWolf entered into the Contract with U.S. Cavalry, and the Contract was

worth over two million dollars, a substantial amount. The payments to IronWolf were largely made from U.S. Cavalry's Kentucky financial institution, and there were numerous phone calls and emails between IronWolf and U.S. Cavalry's Kentucky office. After disputes arose, Mr. Force and his father visited the U.S. Cavalry headquarters to resolve the differences. These few factors do weigh in favor of finding personal jurisdiction. However, a nonresident defendant does not necessarily purposefully avail itself of the benefits and protections of Kentucky's laws merely by entering a contract with a Kentucky party, and such a contract alone does not automatically establish personal jurisdiction. *Kerry Steel*, 106 F.3d at 151 (citing *Burger King*, 471 U.S. at 478).

Nevertheless, the Court concludes that other, more important factors substantially diminish the importance of these facts. Although U.S. Cavalry had its principal place of business in Kentucky, its CEO, Mr. Weisler, also maintained a New Jersey office. Weisler initiated contact with IronWolf from that New Jersey office. He solicited IronWolf's participation in the Contract. The Supreme Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473, (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643 (1950)). Mr. Force and Mr. Weisler negotiated the Contract from Pennsylvania and New Jersey, respectively. IronWolf signed the Contract in Pennsylvania. Just as important, IronWolf's performance under the Contract took place entirely outside of Kentucky. None of the goods that IronWolf ordered for U.S. Cavalry were from Kentucky, and the goods themselves were shipped directly to IronWolf's facility in Berwick, Pennsylvania, and then to the Army in

New Cumberland, Pennsylvania. That IronWolf received certain checks from U.S. Cavalry's Kentucky bank does not amount to a very significant availment of the benefits and protections of Kentucky law. Therefore, the Court concludes that in the formation and performance of the Contract, IronWolf did nothing to purposefully avail itself of the privilege of acting in Kentucky. To hold otherwise would be to offend the notions of "fair play and substantial justice" the Supreme Court in *International Shoe* deemed the essence of the personal jurisdiction inquiry.

V.

In light of the Court's conclusion that U.S. Cavalry has not shown that IronWolf purposefully availed itself of the benefits and protections of Kentucky law, only a brief discussion of the two remaining *Southern Machine* factors is necessary.

It is clear that U.S. Cavalry's causes of action do not arise from IronWolf's activities in Kentucky. The breach of contract claim – the heart of this case – is based upon actions of IronWolf that occurred entirely outside of Kentucky. This second factor "requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." *See WEDGE*, 882 F.2d at 1091, quoting *Southern Machine*, 401 F.2d at 384 n. 27. No such connection is present here. As discussed above, IronWolf ordered the goods from states other than Kentucky and had them shipped to Pennsylvania. By definition, any breach that IronWolf committed was outside of Kentucky. Regarding U.S. Cavalry's breach of implied covenants of good faith and fair dealing and fraud and misrepresentation claims, the Court is not persuaded that IronWolf's single visit to U.S. Cavalry's offices in Kentucky for a two-hour business meeting is sufficient to confer jurisdiction. U.S. Cavalry's single visit to Kentucky does not create a substantial connection between the causes of action and IronWolf's Kentucky

9

activities.

The final *Southern Machine* requirement is that the acts of the defendant or consequences caused by the defendant have a "substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Southern Machine*, 401 F.2d at 381. It follows as a matter of course that if the first two factors are not met, it would be unreasonable to subject a Pennsylvania defendant to suit in Kentucky simply because it responded to a solicitation from a Kentucky company to enter a contract no part of the performance of which occurred in Kentucky. Under *International Shoe* and its progeny, exercise of jurisdiction over IronWolf on the facts presented would not be reasonable.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record